# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00622-COA

**JONICQUA MOFFETT**                                                      **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                  **APPELLEE**

DATE OF JUDGMENT:          04/21/2021
TRIAL JUDGE:               HON. JON MARK WEATHERS
COURT FROM WHICH APPEALED: FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:    OFFICE OF STATE PUBLIC DEFENDER
                           BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                           BY: ALLISON KAY HARTMAN
DISTRICT ATTORNEY:         PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:               AFFIRMED - 08/23/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     A Forrest County jury found Jonicqua Moffett guilty of second-degree murder for the fatal stabbing of her fiancé, Cordaeil Miller. The circuit court sentenced Moffett to serve forty years in the custody of the Mississippi Department of Corrections. Moffett's post-trial motions were denied. Moffett appealed, claiming three errors justify a reversal of her conviction: (1) she received ineffective assistance of counsel when she was "denied due process" because the jury was not properly instructed on three "material defenses"; (2) her inculpatory statement to law enforcement was coerced and therefore should have been suppressed; and (3) the verdict was contrary to the sufficiency and weight of the evidence.

Finding no reversible error, we affirm Moffett's conviction and sentence.

**FACTS**

¶2.     On August 4, 2017, at their residence in Hattiesburg, Mississippi, Moffett and Miller got into an argument that lasted most of the day.[1]  That argument ultimately ended when Moffett stabbed Miller one time in the heart with a knife, resulting in his death.  When the police arrived, Miller was lying next to a vehicle with the driver's side door still open.  The police found a knife with a blade length of approximately seven inches near the vehicle.

¶3.     Moffett initially told the police on scene that she and Miller were arguing and that he left.  She claimed she went inside the residence and later returned outside to find Miller "leaning" against the home with a stab wound.  Moffett told the police that she yelled at family members inside the home to come help.

¶4.     Later at the police station during a recorded interview, Moffett maintained the same story, and the police told Moffett that they had eyewitnesses to the incident.  At that point, Moffett changed her story and told the police that she and Miller had been arguing all day and that she stabbed him to protect herself.  She explained that Miller was verbally abusive, was intoxicated, and had punched her prior to the stabbing.  Moffett stated that she retrieved the knife from the kitchen to protect herself before returning outside and beginning the argument again when the stabbing ultimately occurred.  When Miller tried to get into the vehicle to drive away, Moffett claimed she attempted to stop him, and he turned around and

---

[1] The record is unclear as to what the argument was about and why it continued to escalate.  Miller eventually died at the hospital from a single stab wound.  He never gave a statement to the police.  Moffett gave several statements to the police, which contained different descriptions of that day's events.

struck her in the mouth with his elbow. Moffett stated that Miller bear-hugged her and that is when he was "accidentally" stabbed.

¶5.     Moffett was indicted for first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(1)(c) (Rev. 2018). The indictment specified that Moffett killed Miller while engaged in the commission of the felony crime of aggravated domestic violence.

¶6.     A jury trial occurred from March 22 to March 24, 2021. The State called several witnesses, the first of whom was crime scene Investigator Jeff Byrd. At the time of trial, Investigator Byrd had worked for the Hattiesburg Police Department for thirty-five years. He testified that he had been a crime scene investigator since 1991 and worked crime scenes when requested. On August 5, 2017, the Hattiesburg Police Department requested assistance for a crime scene investigator near the area where Miller had been stabbed. Miller had been removed by the time Investigator Byrd arrived, but he observed Moffett while she was there. Investigator Byrd testified that he photographed Moffett at the scene and did not observe any "injuries to her person." Those photographs were introduced into evidence. Investigator Byrd also testified as to his photographs taken of the front of the house and the location of the vehicle where Miller was found. He additionally identified physical evidence he collected from the crime scene, including a cell phone and knife found lying on the ground. Finally, Investigator Byrd testified as to a statement Moffett gave him at the scene. He stated that Moffett indicated she had an argument with Miller and she went inside the residence while he walked down the street. She later "came back outside and saw [Miller] standing against the residence holding his chest."

3

¶7.     The State also called Investigator Dale Bounds of the Hattiesburg Police Department, who was the lead investigator at the time of incident.  Investigator Bounds took a statement from Moffett at the police station, which was recorded on video.  The video was introduced as an exhibit, but upon agreement of counsel, only portions of the video were actually played for the jury.[2]  Investigator Bounds testified that Moffett continued to tell the same story that she had originally told the first responding officers.  After he told her he had "witnesses to . . . them fussing and fighting all day long," she "admitted to stabbing Mr. Miller" and gave a written statement.   Moffett's written statement was admitted into evidence:

> [Early] tonight around 8:30 my fiancé [(Miller)] walked out of the house with [another woman].  I asked him twice where he was going but he ignored me so I walked outside behind him and asked him again he [replied] nowhere girl but rudely.  I then went inside got my shoes and then walked down the street he seen me and walked back with me to the house.  [The other woman] came in shortly and I told her off then told my fiancé we will talk later. . . .  [M]y fiancé was driving crazy so I got out the car on the corner . . . and walked the rest of the way . . . instead of accepting that he was wrong he started throwing my wrongs in my face . . . .  I began to gather my things first while arguing back and forward with him we began to tussle and a few licks [were] passed so I got out went in and grabbed a knife from the kitchen for protecting because I was scared he would jum[p] on me[.]  I came back out he was seated in the trunk I started yelling at him asking why he was treating me like I did him wrong[.]  [H]e then got up said call the police and went for the driver's side door[.]  I grabbed his arm and he elbowed me then wrapped around me and at some point he got stabbed while I was trying to get him off of me.

¶8.     The defense called two witnesses—Moffett and Maury Phillips with the Mississippi Crime Laboratory.  Moffett testified that she and Miller had been together "about five years."  She claimed she had been a victim of domestic violence with a previous boyfriend, who was the father of her child, and she was not "satisfied with how the police handled it."  Moffett

---

[2] The jury had a copy of the entire videotaped statement during deliberations.

testified that on the day of the incident, she was playing cards with friends and family when "my fiancé walked out the door [with another woman]." She testified that Miller was "heavily intoxicated" when this happened. Moffett followed them and brought Miller back to the house. Then Miller and Moffett went to the store, and Miller "was driving crazy." So Moffett exited the vehicle and walked home. At that time, she explained, "I made my attempts to try to talk to him, but he wasn't hearing it. He again told me I was nothing. Talked to me like I was a dog."

¶9.     Moffett's testimony surrounding the circumstances of Miller's stabbing was somewhat contradictory and confusing. Throughout her testimony, Moffett sometimes indicated the stabbing was an accident yet at other times appeared to claim the stabbing was self-defense. For example, at one point during direct examination, the following exchange occurred between Moffett and her attorney:

> Q.     Let's make it clear. At no point did you intentionally thrust that knife into him?
>
> A.     No, sir.

Despite that testimony, on cross-examination, the following exchange occurred when Moffett was questioned by the State:

> Q.     So when he does that, then you say he bear-hugged you at that point and you are struggling to get free of him and you somehow stab him?
>
> A.     Yes, ma'am.
>
> Q.     So at that moment you were in such fear of your life that you had to stab him?
>
> A.     Yes, ma'am.

In that same vein, she clarified, "I'm not sure if he elbowed me on purpose or not . . . . But I am very sure that he [began] to tussle with me afterwards."

¶10. The State summarized the apparent inconsistencies between accident and an intentional act of self-defense with both of the following questions being admitted by Moffett:

> Q. And it wasn't until you thought that there was someone else that could place the knife in your hands and see you stabbing him, that's when you finally admitted because you said then this was an accident; is that right?
>
> A. Yes, ma'am.
>
> Q. But then today it is a lot of body blows, self-defense, a new physical altercation in the car with an injury to your right side, your upper right side and your left side of your head; is that right?
>
> A. Yes, ma'am.

Finally, when the State asked Moffett if her decision "to go inside, grab a knife, come outside and continue yelling and fighting with [Miller] led to his death," Moffett responded, "Yes, ma'am."

¶11. The final witness for the defense was Maury Phillips. At the time of the incident, Phillips was the chief of toxicology at the Mississippi Crime Laboratory. Phillips was offered and accepted as an expert in the field of blood analysis and toxicology without objection. Phillips testified that the blood extracted from Miller's chest was tested for alcohol, and the results were .178 grams per one-hundred milliliters. Phillips explained that the legal limit for presumed impairment for operating a motor vehicle is .08. Phillips opined that Miller's blood was two times the legal limit.

6

¶12. At the close of trial, the jury found Moffett guilty of second-degree murder. Moffett's post-trial motions were denied, and she appealed.

## ANALYSIS

### 1. Ineffective Assistance of Counsel

¶13. Moffett first argues that her attorney was ineffective for failing to request two separate jury instructions: (1) one for culpable-negligence manslaughter and (2) one for accident or misfortune. Additionally, Moffett argues that her attorney was ineffective for admitting there was no evidence to support a heat-of-passion jury instruction. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016)). Such claims will be addressed on direct appeal when "[(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*. Additionally, such claims may be resolved "on direct appeal when the record affirmatively shows that the claims are without merit." *Id*. "If we do not reverse on other grounds and are unable to conclude that the defendant received ineffective assistance of counsel, we will affirm 'without prejudice to the defendant's right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings.'" *Boudreaux v. State*, 189 So. 3d 1274, 1280 (¶20) (Miss. Ct. App. 2016) (quoting *Colenburg v. State*, 735 So. 2d 1099, 1101 (¶5) (Miss. Ct. App. 1999)).

¶14.　To prove her counsel's assistance was ineffective, Moffett must show (1) her counsel's performance was deficient, and (2) the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. A strong but rebuttable presumption exists that counsel's performance was effective. *Gilley v. State*, 748 So. 2d 123, 129 (¶20) (Miss. 1999). First, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Quinn v. State*, 191 So. 3d 1227, 1234 (¶27) (Miss. 2016) (internal quotation marks omitted). Second, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gilley*, 748 So. 2d at 129 (¶20) (quoting *Strickland*, 466 U.S. at 694). If the defendant cannot satisfy both *Strickland* prongs, her claim fails. *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

¶15.　There is a presumption that decisions made by defense counsel are strategic, and this Court "will not second-guess counsel's decisions that fairly may be characterized as strategic." *Shinn v. State*, 174 So. 3d 961, 966 (¶12) (Miss. Ct. App. 2015). This Court has held that "[c]ounsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy." *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. Ct. App. 2003) (citing *Scott v. State*, 742 So. 2d 1190, 1196 (¶14) (Miss. Ct. App. 1999)). Furthermore, "[h]aving a trial strategy negates an ineffective assistance of counsel claim, regardless of counsel's insufficiencies." *Hall v.*

*State*, 735 So. 2d 1124, 1127 (¶10) (Miss. Ct. App. 1999).

### A.      Failure to Request a Culpable-Negligence Instruction

¶16.    Moffett first argues that her attorney was ineffective for failing to request a culpable-negligence instruction.  More specifically, she argues that she was "entitled" to a culpable-negligence instruction because it is a lesser included offense of murder.

¶17.    Mississippi Code Annotated section 97-3-47 (Rev. 2018) states: "Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter."  "Second degree murder, murder, and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability."  *Woods v. State*, 242 So. 3d 47, 56 (¶37) (Miss. 2018).

¶18.    The record shows that Moffett's attorney initially proceeded on the theory of self-defense or, alternatively, heat-of-passion manslaughter.  However, at trial, Moffett testified that the stabbing was both accidental and in self-defense.  During the jury instruction conference, Moffett's attorney admitted there was insufficient evidence in the record to justify the heat-of-passion manslaughter jury instruction.  Ultimately, the jury was instructed on first-degree murder, second-degree murder, imperfect self-defense manslaughter, and self-defense.

¶19.    "A defendant is entitled to jury instructions on [her] theory of the case whenever there is evidence that would support a jury's finding on that theory."  *Swanagan v. State*, 229 So. 3d 698, 707 (¶40) (Miss. 2017) (quoting *Thomas v. State*, 48 So. 3d 460, 469 (¶23) (Miss. 2010)).  "To be entitled to a lesser-included-offense instruction, a defendant must point to

9

some evidence in the record from which a jury reasonably could find [her] not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013).

¶20. "Traditionally, trial counsel's decision regarding whether to request certain jury instructions is considered trial strategy." *Taylor v. State*, 109 So. 3d 589, 596 (¶27) (Miss. Ct. App. 2013). "Decisions that fall within the realm of trial strategy do not amount to ineffective assistance of counsel." *Pittman v. State*, 121 So. 3d 253, 258 (¶14) (Miss. Ct. App. 2013).

¶21. In *Woods v. State*, the Mississippi Supreme Court held that the defendant's attorney was not ineffective for not requesting a culpable-negligence instruction. *Woods*, 242 So. 3d at 57 (¶41). Similar to Moffett, the defendant in that case was indicted for first-degree murder and found guilty of second-degree murder. *Id.* at 51 (¶¶1-2). On appeal, the supreme court found that "trial counsel's decision was not deficient because it is conceivable that . . . trial counsel did not request a culpable negligence manslaughter instruction as part of his and her strategy." *Id.* at 57 (¶40) (citing *Smiley v. State*, 815 So. 2d 1140, 1148 (¶¶30-33) (Miss. 2002)). Likewise, Moffett's attorney's decision not to request such an instruction could also be considered trial strategy. Thus, it cannot support an ineffective-assistance-of-counsel claim.

### B. Failure to Request an Accident or Misfortune Instruction

¶22. Moffett also argues that her testimony created an evidentiary basis for an accident or misfortune instruction pursuant to Mississippi Code Annotated section 97-3-17 (Rev. 2018).

10

Thus, she argues that her attorney was ineffective for failing to request such an instruction. The "accident or misfortune" instruction Moffett complains of is based on the excusable homicide statute, Mississippi Code Annotated section 97-3-17:

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
>
> (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation . . . .

¶23. The Mississippi Supreme Court recently held that a trial attorney's decision not to request an accident instruction in accordance with section 97-3-17 was permissible trial strategy and therefore not considered ineffective. *Greenleaf v. State*, 267 So. 3d 749, 753 (¶14) (Miss. 2019). In that case, Alondo Greenleaf was convicted of aggravated assault for stabbing Dennis Smith in the back with a knife. *Id*. at 750 (¶1). Before the incident, Greenleaf and Smith were arguing over use of their relative's truck. *Id*. at (¶2). The argument began outside, but eventually they went into the relative's home. *Id*. Smith testified that shortly after they went inside, Greenleaf approached him suddenly and "bear hugged" him, which resulted in the stabbing. *Id*. at (¶4). Smith stated he never saw the knife. *Id*. Greenleaf testified that the stabbing was an accident. *Id*. at 751 (¶5). He explained that after arguing with Smith outside, he went inside the relative's home to feed the dog. *Id*. Greenleaf stated that he was using a kitchen knife to open the dog food when Smith and his friend came inside and "shoved" him. *Id*. Greenleaf claimed he lost his

11

balance and "bear hugged" Smith to try to regain his balance. *Id*. According to Greenleaf, "he dropped the knife during the scuffle and did not know where it went." *Id*. He claimed he did not realize he stabbed Smith until afterward. *Id*. On cross-examination, Greenleaf admitted that he never told law enforcement about a dog or opening a bag of dog food. *Id*. at (¶6). In the State's rebuttal, the officer who had interviewed Greenleaf added that Greenleaf admitted having a knife before entering the house. *Id*.

¶24. On appeal, the supreme court analyzed whether Greenleaf's attorney was ineffective for failing to request an accident instruction pursuant to section 97-3-17. *Greenleaf*, 267 So. at 752 (¶12). The supreme court noted that "Greenleaf's defense at trial was that the stabbing was unintentional, and his defense attorney argued Greenleaf was innocent because the stabbing had been an accident." *Id*. at (¶13). In recognizing the requirements provided in section 97-3-17, the supreme court stated, "We can hardly fault Greenleaf's trial attorney for not requesting an instruction that might confuse the jury by suggesting it was required to find these additional elements in order to acquit Greenleaf based on his accident defense." *Id*. at 753 (¶14).

¶25. In reviewing Moffett's attorney's opening argument and proposed jury instructions, it is evident that the attorney's trial strategy was self-defense. Had her attorney requested an instruction based on section 97-3-17, the jury would have to consider whether Moffett's actions were done during a lawful act by lawful means and with usual and ordinary caution. The consideration of "usual and ordinary caution" had the potential to confuse the jury on the elements of manslaughter and self-defense. Trial counsel may have sought to avoid that

potential confusion. After review, we find that trial counsel's decision not to request such an accident or misfortune instruction falls within the ambit of trial strategy and therefore cannot be considered ineffective. *See Pittman*, 121 So. 3d at 258 (¶14).

### C.     Refusal of Heat-of-Passion Manslaughter Instruction

¶26.    Moffett makes a hybrid claim regarding the circuit court's refusal of the heat-of-passion manslaughter jury instruction. First, she claims that her counsel was ineffective for admitting to the trial court that there was no evidentiary basis for a heat-of-passion manslaughter jury instruction. Specifically, she states that "[w]hen the trial judge asked defense counsel to suggest an evidentiary basis for the instruction, counsel erroneously said there was no such factual basis." Second, she also "respectfully suggest[s] that the trial judge abused his discretion in denying the requested instruction . . . ."

¶27.    Moffett's attorney initially submitted the following heat-of-passion manslaughter jury instruction to the court:

> Heat of passion is when a person acts in a state of violent and uncontrollable rage. The person must have been provoked into acting in such a manner by some act(s) or word(s) which would reasonably lead to an angry, hateful, resentful, or terrified emotional state of mind. If a person kills in the heat of passion, the homicide is manslaughter and not murder.
>
> If you find from the evidence in this case that:
>
> 1.     On or about August 4, 2017 in Forrest County;
>
> 2.     Jonicqua Moffett was provoked in such a manner to lead her into an angry, hateful, resentful, or terrified state of mind
>
> 3.     and in such state of mind killed Cordaeil Miller
>
> then you may find Jonicqua Moffett guilty of the lesser-included offense of

13

Manslaughter.

> If the State failed to prove any of the above elements to you beyond a reasonable doubt, then you must find Jonicqua Moffett Not Guilty.

¶28. During the jury instruction conference, the State objected to the instruction. When the court asked Moffett's attorney to point to evidence in the record to support the instruction, he responded, "Your honor, candor to the tribunal, I cannot. This instruction was submitted, again, before testimony began. If we had developed that line, that theory of defense, we would be pushing for it. As it stands, I've submitted it." The court stated, "I'll make the job easy and I'm going to rule against it . . . . [Moffett] has failed to provide any evidence that she was in a state of violent rage or any uncontrollable rage at the time of the stabbing."

¶29. The Mississippi Supreme Court has defined heat of passion as:

> [A] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996) (quoting *Buchanan v. State*, 567 So. 2d 194, 197 (Miss. 1990)). As stated by the circuit court, the record is devoid of any evidence showing that Moffett acted in a state of violent and uncontrollable rage as a result of her argument with Miller. In her statement to the police, Moffett stated that she and Miller "began to tussle and a few licks [were] passed so [she] got out[,] went in[,] and grabbed a knife from the kitchen for protect[ion]" because she was scared he would "jump" her. Moffett then "came back out" to confront Miller. Moffett claimed that as the argument continued to escalate, "at

14

some point he got stabbed while I was trying to get him off of me." At trial, Moffett similarly testified that during their argument, she walked away from Miller, walked past her family members to the kitchen to grab a knife for protection, and then returned outside to where she "knew there would be an argument." None of this evidence supports that Moffett acted in the heat of passion and her attorney, following the mandate imposed on all attorneys in the Mississippi Rules of Professional Conduct of candor to a tribunal, admitted as much.[3]

¶30. Moffett also argues that the circuit court erred in refusing Jury Instruction D-16. "[T]he standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). The instructions must be read as a whole, and "if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id*. (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶176) (Miss. 2006)). As discussed above, there was no evidence to justify an instruction explaining heat-of-passion manslaughter. There was no evidence that Moffett acted in a state of violent or uncontrollable rage. Accordingly, we find no abuse of discretion in the circuit court's refusal of Jury Instruction D-16.

### 2. Moffett's Confession

¶31. Moffett contends that the police coerced her into giving a statement and that the circuit court erred in allowing her videotaped statement and written statement into evidence. "Whether a confession is admissible is a fact-finding function for the trial court, and its decision will not be overturned unless the trial court applied an incorrect legal standard,

---

[3] *See* Mississippi Rule of Professional Conduct 3.3.

committed manifest error, or made a decision against the overwhelming weight of the evidence." *Haynes v. State*, 934 So. 2d 983, 988 (¶15) (Miss. 2006).

¶32.   Before trial, Moffett's attorney filed a motion to suppress her videotaped statement given to the police.  First, she claimed that she was told "explicit lies" that witnesses saw her stab Miller.[4]   Second, she claimed that after she expressed concern for her children, Investigator Bounds said, "[Y]ou're not going to lose your kids."   In response, the State argued that a police officer's telling a suspect there were eyewitnesses to the crime is an investigative police technique that is constitutionally allowed, and the officer's comment about Moffett's children was not a promise that caused her to confess but a true statement. The State explained that Moffett would not "lose" her children if she went to jail.

¶33.   One week before trial, the court held a hearing on the motion.  Investigator Bounds testified and provided context for his statement.  When asked why he made that statement to Moffett, he responded:

> I mean, just because you get arrested and possibly go to jail, that doesn't mean you are going to lose your children.  I mean, even if you do go to prison, you can have visitation with your children.  So you are not going to lose your children.  Your children are going to be your children regardless.

The State also offered Moffett's videotaped statement as Exhibit A at the hearing.[5] Reviewing the video, the exchange between Investigator Bounds and Moffett went as

---

[4] She does not make this argument on appeal.  However, it is worth noting that the United States Supreme Court has held that law enforcement does not have to be completely honest when interrogating a suspect. *See, e.g.*, *Illinois v. Perkins,* 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security" are permissible during police questioning, as long as they do not "rise to the level of compulsion or coercion.").

[5] There is no transcript for the videotaped statement.

16

follows:

| | |
|---|---|
| Investigator Bounds: | Tell me the whole story of what happened. |
| Moffett: | I got kids, bro. |
| Investigator Bounds: | I understand you got kids, baby. |
| Moffett: | I'm not trying to be away from my babies. |
| Investigator Bounds: | Baby, I understand you're not trying to be away from your babies. |
| Moffett: | I've never been in trouble. |
| Investigator Bounds: | I understand you've never been in trouble before, but it happened. It got heated . . . and it happened. [inaudible] I know it pissed you off. I know it did. It would have pissed me off . . . , but now's the time for you to tell me the whole story . . . . |
| Moffett: | I don't want to lose my kids. |
| Investigator Bounds: | Baby, you're not going to lose your kids . . . . |
| Moffett: | If I go away I'll lose 'em. |
| Investigator Bounds: | Who said you're going away? |
| Moffett: | Ok. I'll tell you everything. |

The defense did not call any witnesses at the suppression hearing to contradict the State's proof offered at the hearing. The court ultimately denied the motion to suppress, and Moffett's handwritten statement and videotaped statement were admitted into evidence. By agreement of counsel, only parts of the videotaped statement were actually played for the jury.

17

¶34.    Moffett's sole argument on appeal is that Investigator Bounds' statements regarding her children resulted in her involuntary confession.  In her own words, she claims that "[Investigator] Bounds crossed over the line of imploring [her] to simply tell the truth in stating to her, without any knowledge or information, that she would not lose her children."

¶35.    "A defendant's confession may be allowed into evidence over objection only where the trial judge finds the confession was intelligently, knowingly, and voluntarily made, rather than bargained for with promises, threats, or inducements by law enforcement officers." *Johnson v. State*, 129 So. 3d 148, 150 (¶10) (Miss. 2013) (footnotes omitted).  Further, "the trial court must determine from the totality of the circumstances whether the confession was 'the product of the accused's free and rational choice.'" *Burford v. State*, 320 So. 3d 502, 511 (¶16) (Miss. 2021) (quoting *Porter v. State*, 616 So. 2d 899, 907-08 (Miss. 1993)).

¶36.    "The State has the burden of proving the voluntariness of a confession." *Agee v. State*, 185 So. 2d 671, 673 (Miss. 1966).  "If, after the State makes a prima facie case, the defendant testifies that the confession was induced by threats, promises, or offer of reward, then the burden shifts back to the State to rebut the defendant's testimony with testimony from "those persons who are claimed to have induced a confession through some means of coercion[.]"  *Burford*, 320 So. 3d at 511 (¶16) (quoting *Thorson v. State*, 653 So. 2d 876, 888 (Miss. 1994)).  Notably here, Moffett did not testify at the suppression hearing.

¶37.    "If a confession is the result of threat, inducements or promises—however slight—it is not voluntary."  *Id*. at (¶17) (quoting *Manix v. State*, 895 So. 2d 167, 180 (¶40) (Miss. 2005)).  "The test in such cases is whether the inducement is of a nature calculated under the

18

circumstances to induce a confession irrespective of its truth or falsity . . . ." *Robinson v. State*, 247 Miss. 609, 612-13, 157 So. 2d 49, 51 (1963).

¶38.    The Mississippi Supreme Court has held that "[a] mere exhortation to tell the truth is not an improper inducement that will result in an inadmissible confession." *Harden v. State*, 59 So. 3d 594, 605 (¶26) (Miss. 2011) (citing *Ruffin v. State*, 992 So. 2d 1165, 1172 (¶20) (Miss. 2008)); *see also Flowers v. State*, 601 So. 2d 828, 831 (Miss. 1992). On the contrary, the Mississippi Supreme Court has "condemned the practice whereby law enforcement interrogators, or related third parties, convey to suspects the impression, however slight, that cooperation by the suspect might be of some benefit." *Abram v. State*, 606 So. 2d 1015, 1031 (Miss. 1992), *reversed on other grounds by Foster v. State*, 961 So. 2d 670 (Miss. 2007) (reversing defendant's capital-murder conviction, finding his confession involuntary because he "was encouraged to do right by God," "was given hope of leniency, and was confronted with the legal and religious consequences of his refusal to cooperate").

¶39.    In *Burford v. State*, the Mississippi Supreme Court held that the defendant's trial attorney was deficient for not filing a motion to suppress the defendant's confession despite "strong evidence" that it was induced by threats and promises. *Burford*, 320 So. 3d at 513 (¶22). Specifically, the officers told the defendant that "if she did not cooperate, she would remain in jail, she would not be released on bond, and her children would be taken away." *Id.* One of the officers also told the defendant she would get a lower bond if she were honest. *Id.* Those statements ultimately led the defendant to confess as an accomplice to burglary in both a videoed statement and written statement. *Id.* The video showed that after she

19

confessed, one of the officers "called the courthouse to obtain a bond for her." *Id*.

¶40.    *Burford* is materially distinguishable from the present case. Here, Investigator Bounds simply responded to Moffett's expressed concern that she did not want to lose her children. At the suppression hearing, he further explained that in his response, he meant that she was not going to lose her children in a literal sense if she got arrested or went to jail. Based on Investigator Bounds' response to Moffett's expressed concern, it is hard to comprehend how the truth can be coercive in this specific case. If courts were to hold it impermissible coercion by law enforcement when stating a known truth to a defendant in response to a concern expressed by the defendant, then that would signal the end to almost any type of police interrogation. The trial court listened to the testimony produced at the suppression hearing, including Investigator Bounds' testimony. The court judged the credibility of Investigator Bounds and never heard a contrary version of facts.

¶41.    After review, we cannot find that "the trial court applied an incorrect legal standard, committed manifest error, or made a decision against the overwhelming weight of the evidence." *See Haynes*, 934 So. 2d at 988 (¶15). Accordingly, we affirm the trial court's denial of Moffett's motion to suppress her confession and its admission of the confession into evidence.

### 3.    Sufficiency and Weight of the Evidence

¶42.    Finally, Moffett argues that there was insufficient evidence to support her conviction and that the verdict was against the overwhelming weight of the evidence. We address each argument in turn below.

¶43.    Sufficiency-of-the-evidence claims are reviewed de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018).  When reviewing a challenge to the sufficiency of the evidence, "[t]he relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)).  The evidence is viewed in the light most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence presented at trial.  *Henley v. State*, 136 So. 3d 413, 415-16 (¶8) (Miss. 2014). "This Court will reverse and render only when the facts point so overwhelmingly in favor of the defendant that reasonable [jurors] could not have found, beyond a reasonable doubt, the defendant was guilty."  *Jones v. State*, 991 So. 2d 629, 634 (¶11) (Miss. Ct. App. 2008).

¶44.    Here, there is no dispute that Moffett stabbed Miller.  The only pertinent question is whether the State presented sufficient evidence that Moffett stabbed Miller while engaged in "an act eminently dangerous to others and evincing a depraved heart," as necessary for second-degree murder.  *See* Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2018).  Both Moffett's written and videotaped statement show that she left an altercation with her fiancé and returned with a knife and continued the altercation by "yelling" at him.  In her written statement, she wrote, "I grabbed his arm and he elbowed me then wrapped around me and at some point he got stabbed while I was trying to get him off of me."  During her testimony at trial, Moffett's story changed from accidentally stabbing Miller to intentionally stabbing Miller to protect herself.  For example, when the State asked if she "had to stab [Miller]" because she was "in such fear of [her] life," Moffett responded, "Yes, ma'am."

21

¶45. The jury is the ultimate trier of fact, so it must "listen to the evidence, observe the demeanor of the witnesses, and decide the issue of the credibility of the witnesses and what weight to give to any particular piece of evidence." *Johnson v. State*, 311 So. 3d 1161, 1181 (¶46) (Miss. Ct. App. 2020) (quoting *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000)). Here, the jury listened to the evidence, including Moffett's written statement, her videotaped statement, and the witness testimony, and ultimately found Moffett guilty of second-degree murder. In considering the evidence in a light most favorable to the State, this Court finds that a reasonable juror could have found that the State proved the essential elements of second-degree murder beyond a reasonable doubt.

¶46. Moffett also argues that the verdict was against the overwhelming weight of the evidence. "A motion for new trial falls within a lower standard of review than does that of a judgment notwithstanding the verdict or a directed verdict. A motion for a new trial simply challenges the weight of the evidence." *Lacey v. State*, 310 So. 3d 1206, 1215 (¶22) (Miss. Ct. App. 2020) (quoting *Daniels v. State*, 107 So. 3d 961, 963 (¶12) (Miss. 2013)). Our role as an "appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

¶47. When reviewing a challenge to the weight of the evidence, this Court must determine whether the trial court abused its discretion by not ordering a new trial. *Daniels*, 107 So. 3d at 963 (¶12). When determining if a trial court abused its discretion in denying a motion for

a new trial, this Court will not act as the "thirteenth juror." *Little*, 233 So. 3d at 292 (¶20). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id*. at 289 (¶1).

¶48. Here, as previously discussed, the jury judged each witness's credibility and ultimately determined that Moffett was guilty of second-degree murder. Viewed in the light most favorable to the verdict, we cannot find that the verdict was contrary to the overwhelming weight of the evidence or that allowing it to stand would sanction an unconscionable injustice. Therefore, the judgment is affirmed.

## CONCLUSION

¶49. After review of the record, this Court concludes that Moffett's ineffective-assistance-of-counsel claims are without merit. This Court also finds that the circuit court did not err in allowing Moffett's confession into evidence or refusing a heat-of-passion manslaughter jury instruction. Finally, we find that there was sufficient evidence to support Moffett's conviction of second-degree murder and that the verdict was not against the overwhelming weight of the evidence. Accordingly, we affirm Moffett's conviction and sentence.

¶50. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

23